IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---------------------------------------------------------x
ELBIO NUNES, THEODORE SPIES, and
MARQUE HART, individually and on behalf
of those similarly situated,                                        Civil Action No.

                      Plaintiffs,

      -against-                                                       **COLLECTIVE ACTION**
                                                                  **JURY TRIAL DEMANDED**


LASERSHIP, INC.,

                      Defendant.
---------------------------------------------------------x

## COMPLAINT

Plaintiffs Elbio Nunes, Theodore Spies, and Marque Hart (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Complaint against Defendant LaserShip, Inc. ("Defendant" or "LaserShip"), and show the Court as follows:

1

# I. <u>NATURE OF ACTION</u>

1. This is a case brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), seeking damages for Defendant's failure to pay its employees overtime for all hours worked over 40 in a week.

2. Plaintiffs and members of the putative Collective are current and former employees of LaserShip, a "last mile" courier company that bills itself on its website as providing "Last Mile Delivery That Creates Competitive Advantage." The source of that competitive advantage, however, is LaserShip's exploitation of its employees, evasion of payroll taxes, and widespread violations of the wage and hour laws.

3. LaserShip contracts with online retailers like Amazon.com to deliver goods to consumers at commercial and residential addresses, and it fundamentally relies on the work of delivery drivers like Plaintiffs and members of the putative Collective to carry out the crux of its business model.

4. Though LaserShip refers to its drivers as "independent contractors" and pays them accordingly, they are, in fact, employees subject to an extremely high degree of control and supervision by LaserShip.

5. LaserShip obtains these drivers by hiring them directly and by contracting with subcontractor companies who, alongside LaserShip, jointly

employ the drivers. These subcontractors function as interchangeable strawmen to insulate LaserShip from liability for its wage and hour violations. Many of them are delivery drivers themselves.

6. Plaintiffs file this lawsuit individually and as an FLSA collective action on behalf of all similarly situated current and former employees of Defendant in the State of Georgia.

7. Plaintiffs and putative members of the Collective Action seek all damages available under the FLSA, including back wages, liquidated damages, legal fees, costs, and post-judgment interest to the extent that liquidated damages are not awarded.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

9. Venue is proper in the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. § 1391(b)(1) and Civil Local Rule 3.1, as Defendant conducts business in Cobb County to a sufficient degree to be considered a resident of this district under 28 U.S.C. § 1391(d).

10. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### III. PARTIES

#### Plaintiff Elbio Nunes

11. Plaintiff Elbio Nunes is an individual residing in Cobb County, Georgia. Nunes has standing to file this lawsuit.

12. Plaintiff Nunes began working for Defendant as a delivery driver in or around August 2015. Plaintiff ceased working for Defendant on or about March 16, 2022.

13. Plaintiff Nunes's written consent to participate in this lawsuit is filed along with this Complaint.

#### Plaintiff Theodore Spies

14. Plaintiff Theodore Spies is an individual residing in Cherokee County, Georgia. Mr. Spies has standing to file this lawsuit.

15. Plaintiff Spies worked as a delivery driver for Defendant for six months in 2017 and then again beginning in or around June 2019. Mr. Spies continues to work as a delivery driver for LaserShip today.

16. Plaintiff Spies' written consent to participate in this lawsuit is filed along with this Complaint.

### Plaintiff Marque Hart

17. Plaintiff Marque Hart is an individual residing in DeKalb County, Georgia. Mr. Hart has standing to file this lawsuit.

18. Plaintiff Hart worked as a delivery driver for Defendant in 2016, and again from 2018 until December of 2021.

19. Plaintiff Hart's written consent to participate in this lawsuit is filed along with this Complaint.

### Collective Action Members

20. The putative Collective Action Members are all current or former employees of Defendant who made deliveries and who were not paid one-and-one-half times their regular rate of pay for hours worked over 40 in a week. The relevant time period for the claims of the putative Collective Action Members is no less than three years preceding the date each Member's claim is filed and until Defendant ceases or is enjoined from violating the FLSA.

### Defendant LaserShip, Inc.

21. Defendant LaserShip, Inc. ("LaserShip"), is a Delaware corporation with its headquarters located at 1912 Woodford Road, Vienna, VA 22182.

22. LaserShip transacts business in the State of Georgia.

23. Over the past several years, LaserShip has owned and operated warehouses in the in the cities of Kennesaw, Marietta, and Smyrna. As of this filing, LaserShip operates out of a warehouse located at 6300 Highlands Parkway SE in Smyrna, GA, having relocated from a warehouse in Marietta, GA.

## IV. COLLECTIVE ALLEGATIONS

24. Plaintiffs bring their FLSA minimum wage and overtime claims on behalf of themselves and all similarly situated persons who have worked for LaserShip performing delivery driver services in the State of Georgia from a date no less than three years prior to the filing of this action until the date Defendant ceases, or is enjoined from, violating the FLSA ("FLSA Collective").

25. Plaintiffs and members of the FLSA Collective consistently worked at least 60 hours per week (often 70 or 80 hours per week) and were never paid overtime for those hours worked over 40.

26. Defendant did not keep track of the Plaintiffs' and Collective Action Members' working hours.

27. Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs, and as such, notice should be sent to the FLSA Collective.

Terms and Conditions of Employment

28.     Plaintiffs and the proposed FLSA Collective are current and former delivery drivers whose job duties involved working on the warehouse sorting line and loading, unloading, and delivering packages from LaserShip warehouses to commercial and residential buildings in the State of Georgia.

29.     Though characterized as "independent contractors" by Defendant, Plaintiffs' work and the work of all Collective Members was performed under Defendant's total direction and control, thereby rendering them "employees" within the meaning of the FLSA.

30.     Each driver was assigned a specific delivery route by LaserShip and, each day, was required to deliver all of the packages along that route that LaserShip assigned to them.

31.     If, for any reason, drivers were unable to deliver all of the packages assigned to them, LaserShip management would discipline them by, *inter alia*, suspending them without pay, moving them to a less desirable route, or firing them.

32.     Though many drivers began their employment with the expectation of working five days a week, Monday through Friday, LaserShip routinely required

its drivers to come in on Saturdays and Sundays as well. This was frequently the case around the holidays, though not exclusively.

33. If a driver could not report to work on a Saturday or Sunday, LaserShip threatened to terminate their employment.

34. Plaintiffs and members of the Collective therefore worked 6 or 7 days a week, at least 10–14 hours per day.

35. If a delivery driver did not report for work by 9:00 or 10:00 a.m. on a particular day, LaserShip would take away that driver's route and give it to another driver.

36. Depending on how well staffed the warehouse was with LaserShip-employed package sorters when the drivers reported for work each morning, they would either find their packages pre-sorted and ready to be loaded into their delivery vans, or they would be required to search the warehouse themselves and work on the sorting line until they had gathered all of their packages. This occurred on average 2–4 times per week, and on occasion every day in the workweek. The drivers were not compensated for this time.

37. Instead, LaserShip paid each driver on a per-package basis, with rates ranging anywhere from $0.50 to $5.00 per package delivered.

38. More often than not, drivers were paid $2.00 per package.

8

39. Drivers did not have the ability to negotiate their rates.

40. While making their deliveries, drivers were required to wear LaserShip uniforms and drove vans with the LaserShip logo prominently displayed on their exteriors.

41. To access and upload information about their routes and deliveries, the delivery drivers were required to use and install a proprietary LaserShip application ("Elli") on their personal smartphones.

42. The Elli app used GPS to track delivery drivers' locations in real time, and instructed them which routes to take and in which order to deliver their packages.

43. Customers could not specifically request delivery services from any particular delivery driver.

44. Delivery drivers were not responsible for fielding customer complaints. On information and belief, LaserShip was solely responsible for fielding such complaints.

45. If drivers requested time off, LaserShip would threaten to take away their route.

46. Drivers received their pay via check or direct deposit, with LaserShip identified as the payor.

47.     Though drivers were required to use the Elli app and could not opt out, LaserShip deducted $17.50 per week from each driver's paycheck as a service fee for using the app.

48.     LaserShip also deducted money from each driver's weekly paycheck for mandatory cargo and occupational insurance.

49.     Drivers were further required to purchase car insurance directly from LaserShip.

50.     Plaintiffs and all LaserShip drivers made their deliveries exclusively in minivans and other vehicles with a gross weight of under 10,000 pounds.

51.     Plaintiffs and all LaserShip drivers were never paid additional money for the hours worked greater than 40 in a workweek.

## V. INDIVIDUAL FACTUAL ALLEGATIONS

### Elbio Nunes

52.     Plaintiff Elbio Nunes started working as a delivery driver for LaserShip in or around mid-August 2015.

53.     He resigned roughly six-and-a-half years later, on or around March 16, 2022.

54. For the entirety of his employment, Mr. Nunes's primary job responsibility was to sort and deliver packages from LaserShip's warehouse to customers along a pre-assigned route in the State of Georgia.

55. Over the course of his employment, LaserShip had three different Georgia warehouses: in Marietta, in Kennesaw, and most recently at 6300 Highland Parkway in Smyrna.

56. Six (and often seven) days a week, Mr. Nunes reported to the LaserShip warehouse between 4:00 a.m. and 6:00 a.m.

57. On average, he worked between 10–14 hours per day.

58. Three to four times a week, when the warehouse was understaffed, he was required to work on the sorting line before he could load his packages and begin his route.

59. Sorting packages would typically take two to three hours.

60. Mr. Nunes was not compensated for his time spent sorting.

61. Between 2015 and 2018, LaserShip paid Mr. Nunes directly as an independent contractor.

62. In 2018, LaserShip informed Mr. Nunes that, in order to continue getting paid, he would be required to form an LLC through which LaserShip would

then pay him his wages. Upon information and belief, this was in response to other overtime lawsuits filed against Lasership on behalf of its drivers.

63. Thereafter, Mr. Nunes was paid through his LLC, B-Line Final Mile.

64. For the week between March 5 and March 11, 2022, Mr. Nunes worked at least 60 hours and was paid $857.75. After deducting for occupational insurance, cargo insurance, the Elli app, and "carryover," Mr. Nunes was left with $757.25.

65. Mr. Nunes did not receive any overtime premium for hours worked in excess of 40 during that week or any other week.

66. On March 16, 2022, Mr. Nunes had been assigned 180 packages to deliver and was unable to deliver approximately 50 of them. For the first time in his nearly seven-year history with the company, he was forced to leave some packages behind at the warehouse.

67. The LaserShip operations manager responded by telling him to deliver the 50 packages or else "face consequences."

68. Mr. Nunes then resigned from his employment.

## Theodore "Teddy" Spies

69.	Mr. Spies first started working for LaserShip in 2017. He reported to the Kennesaw warehouse and delivered packages for approximately six months. He resigned when the company took away one of his routes without warning.

70.	Mr. Spies then returned to LaserShip and the Kennesaw warehouse in or around June 2019.

71.	Beginning in November 2021, he reported to the LaserShip warehouse located at 6300 Highlands Parkway in Smyrna.

72.	Mr. Spies continues delivering packages for LaserShip today.

73.	His shift typically runs from 8:30 a.m. to 6:30 p.m.

74.	On average, Mr. Spies works 60–70 hours per week, depending on whether he works 6 or 7 days in a particular week.

75.	On average, Mr. Spies earns $1100–$1400 per week if he works 6 days.

76.	Mr. Spies has never received any overtime premium for hours worked in excess of 40 in a week.

77.	On May 11, 2022, Mr. Spies received a call from a female LaserShip manager while he was delivering packages on his route.

78. This manager informed him that there was another package at the warehouse that he needed to deliver. Mr. Spies responded that a "floater" driver had taken care of that package.

79. When he arrived at the warehouse on the morning of May 12, Mr. Spies learned that he was suspended without pay for two days.

80. Beginning the week of May 23, 2022, LaserShip refused to allow any drivers including Mr. Spies out of the warehouse in the morning until every package on their routes was accounted for.

81. This meant that if drivers had any attempted deliveries from the day before, they were forced to wait in line for approximately one hour to sort it out with dispatch.

82. Drivers were not paid for this time.

83. On May 23, 2022, while delivering packages, Mr. Spies received a call from his manager, Kay, telling him that he had to return to the warehouse to pick up a package that had allegedly been left off his vehicle. Kay then told him that she would take care of it.

84. The next day upon arrival at work, Mr. Spies learned he was suspended because he had not personally returned to the warehouse for the package the day before.

### Marque Hart

85. Marque Hart worked for LaserShip in 2016, and then from 2018 until December of 2021.

86. Mr. Hart worked for LaserShip 6–7 days per week, always working more than 40 hours per week.

87. Like the other drivers, Mr. Hart was made to work in the warehouse on the sorting line 2–5 days per week. Mr. Hart was sometimes made to unload the trucks making deliveries to LaserShip. He was never compensated for this work.

88. LaserShip management would often lock the warehouse gates, preventing the drivers from leaving to deliver their packages until LaserShip management was satisfied that all packages had been given to the drivers.

89. Mr. Hart and the other drivers were not paid for this waiting time.

90. Mr. Hart was never paid any additional money for the hours worked over 40 in a week.

## VI. FIRST CAUSE OF ACTION
**Fair Labor Standards Act – Unpaid Overtime Wages**

91. At all times relevant to this action, Defendant employed Plaintiffs and Collective Members within the meaning of the FLSA, 29 U.S.C. § 203(d).

92. At all times relevant to this action, Plaintiffs and Collective Members were engaged in commerce and the corporate Defendant was an enterprise engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

93. Plaintiffs consent to be parties to this action, pursuant to 29 U.S.C. § 216(b).

94. Plaintiffs seek to bring claims under the FLSA, 29 U.S.C. § 216(b), individually and on behalf of a collective preliminarily defined as:

> **All current and former employees of Defendant who worked without receiving overtime premium pay for all hours worked over forty in each seven-day workweek for the time period beginning no less than three years prior to the filing of this lawsuit through the date of the final disposition of this action.**

95. Defendant violated the rights of Plaintiffs and Collective Members by failing to pay them overtime compensation at a rate of one-and-one-half times their regular rate of pay for each hour worked in excess of 40 per week, in violation of the FLSA, 29 U.S.C. § 207(a)(1).

96. Plaintiffs have personal knowledge that other putative Collective Action Members were paid pursuant to the same policy, namely, paid a per-package rate for all hours of work without receiving overtime premium pay for all hours worked over forty (40) in each seven-day workweek.

97. Defendant's failure to pay Plaintiffs and Collective Members overtime compensation was willful within the meaning of the FLSA, 29 U.S.C. § 255.

98. Defendant's failure to pay Plaintiffs and Collective Members overtime compensation was not done in "good faith" within the meaning of 29 U.S.C. § 260.

99. Where, as here, the employer's actions or policies were effectuated on a companywide basis, notice may be sent to all similarly situated persons on a companywide basis.

100. The putative Collective Action Members are not exempt from receiving overtime premium pay under the FLSA.

101. Defendant's failure to pay overtime wages results from generally applicable policies or practices, and does not depend on the personal circumstances of the putative Collective Action Members.

102. The specific job titles or precise job responsibilities of each putative collective action member do not prevent collective treatment.

103. Although the exact amount of damages may vary among the putative collective action members, their respective damages are easily calculable using a simple formula uniformly applicable to all of them.

104. Plaintiffs reserve the right to establish sub-classes and/or modify class notice language as appropriate in any motion to certify a collective action or other proceeding.

105. Plaintiffs further reserve the right to amend the definition of the putative collective, or subclasses therein, if discovery and further investigation reveal that the putative collective should be expanded or otherwise modified.

106. Defendant is liable to Plaintiffs and Collective Members for their unpaid overtime compensation, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, interest, and any other appropriate relief pursuant to 29 U.S.C. § 216(b).

## VII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

a. That, at the earliest possible time, Plaintiffs through their counsel be permitted to give notice of this collective action, or that the Court issue such notice of this collective action, or that the Court issue such notice to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of the Court's issuance of court-supervised notice, been employed by

Defendant. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper hourly compensation and overtime wages;

b. Designation of the named Plaintiffs as class representatives and designation of Plaintiffs' counsel of record as class counsel;

c. Unpaid wages, attorneys' fees, and costs pursuant to 29 U.S.C. §§ 201 *et seq.*;

d. An additional and equal amount in unpaid wages as liquidated damages;

e. Pre-judgement interest to the extent that liquidated damages are not awarded;

f. Issuance of a declaratory judgement that the practices complained of herein are unlawful under the FLSA and a permanent injunction against Defendant's continued engagement in such practices.

## VIII. **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all questions of fact raised by the Complaint.

Dated: July 26, 2022

                Respectfully submitted,

                **MENKEN SIMPSON & ROZGER LLP**

80 Pine St., 33rd Fl.         *s/ Jason Rozger*
T: (212) 509-1616         Jason Rozger
F: (212) 509-8088         PRO HAC VICE APPLICATION TO BE FILED
jrozger@nyemployeelaw.com

                **DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC**

                *s/ Matthew W. Herrington*
101 Marietta Street        Charles R. Bridgers
Suite 2650        Ga. Bar No. 080791
Atlanta, Georgia 30303        Matthew W. Herrington
(404) 979-3150        Georgia Bar No. 275411
(404) 979-3170 (f)
charlesbridgers@dcbflegal.com
matthew.herrington@dcbflegal.com

                *Attorneys for Plaintiffs and the Proposed FLSA Collective*